UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| CENTRAL STATES FAIR, INC.<br><br>　　　　　Plaintiff,<br><br>v.<br><br>PHILADELPHIA INDEMNITY<br>INSURANCE COMPANY,<br><br>　　　　　Defendant. | Civil No. *17-5049*<br><br>**COMPLAINT** |

COMES NOW Central States Fair, Inc. and for its complaint against Philadelphia Indemnity Insurance Company states and alleges as follows:

Parties

1.　Plaintiff Central States Fair, Inc. ("CSF") is a non-profit corporation organized under the laws of the State of South Dakota with its principle place of business in Rapid City, SD.

2.　On Plaintiff's best information and belief, defendant Philadelphia Indemnity Insurance Company ("Philadelphia") is an insurance company with its principle place of business in the State of Pennsylvania.

Jurisdiction and Venue

3.　Jurisdiction is appropriate pursuant to 28 USC § 1332 as complete diversity of citizenship exists between the parties and the amount in controversy exceeds seventy five thousand dollars ($75,000) exclusive of interest and costs.

4.　Venue is proper as the District of South Dakota is the geographic location giving rise to this action.

1

Background Facts

5. CSF exists broadly to support and regionally promote agricultural interests in Western South Dakota.

6. CSF has developed and promotes an annual event called the "Black Hills Stock Show & Rodeo" which is known more generally as the "Black Hills Stock Show."

7. Since at least 1966 and continuing to date, the Black Hills Stock Show has involved the production of a variety of activities including, but not limited to, livestock shows and sales, a vendor trade show and various entertainment events.

8. For many years the Black Hills Stock Show has included Professional Rodeo Cowboys Association (PRCA) sanctioned rodeo events which has been and is produced by Sutton Rodeos, Inc. ("Sutton Rodeos").

9. CSF has federally registered the trademarks for "Black Hills Stock Show & Rodeo" and "Black Hills Stock Show" ("the marks").

10. Presumably by virtue of their involvement with the Black Hill Stock Show, Sutton Rodeos has at various times attempted to assert trademark rights to the marks. By way of example Sutton Rodeos or its principles filed for registration of a corporation in South Dakota under the name Black Hills Stock Show and Rodeo, Inc. In addition, Sutton Rodeos variously claimed rights by first use to the phrase Black Hills Stock Show Rodeo.

11. The issues regarding trademark use and ownership of the marks came to a head in late 2012 when Sutton Rodeos published and distributed various promotions for its rodeo events to be held during the Black Hills Stock Show, using the marks without permission from CSF.

12. CSF sent cease and desist letters to Sutton Rodeos regarding use of the marks. In response, Sutton Rodeos generally claimed entitlement to use the marks.

13. CSF filed suit against Sutton Rodeos and James Sutton in United States District Court on July 10, 2013, alleging trademark infringement and related claims.

14. Sutton Rodeos and James Sutton filed an Answer and Counterclaim on August 16, 2013, where they claimed ownership of the marks and alleged trademark infringement and unfair competition in numerous respects against CSF for use of the marks.

15. Suttons' counterclaim against CSF sought: 1) permanent injunction; 2) cancellation of CSF's registration of the marks; 3) compensatory, enhanced and punitive damages for alleged trade mark infringement; and 4) attorney fees and costs.

16. Sutton Rodeos was represented by its local attorney along with an attorney specializing in intellectual property matters. An additional attorney specializing in trademark litigation later made an appearance on behalf of the defendants.

17. By virtue of the pleadings, the issues in both the CSF Complaint and Sutton Rodeos' Counterclaim involved the ownership and enforceability of the BLACK HILLS STOCK SHOW and BLACK HILLS STOCK SHOW & RODEO trademarks, trademark infringement, injunctive relief and damages.

CSF Policy of Insurance with Philadelphia

18. At all relevant times, CSF was insured by the defendant Philadelphia under a general commercial liability policy of insurance known as a "Flexi-Plus Five" policy which provided coverage for Personal and Advertising Injury including alleged trademark infringement.

19. Upon review of its policy, CSF provided notice to Philadelphia of the claims and allegations set forth in Answer and Counterclaim.

20. Part 8 of the Philadelphia policy of insurance contained the Common Policy Conditions. Section III of Common Policy Conditions addresses Philadelphia's responsibilities when

3

presented with a claim by insureds such as CSF. Section III pertaining to defense of claims and defense costs provides (with bold text in original denoting terms defined in the policy here and throughout):

> A.  The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim**. However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**. Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all the provisions of this Section III. DEFENSE AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.
>
> B.  If the **Insured** has assumed the defense of a **Claim** pursuant to A, above, the **Underwriter** shall advance the **Defense Costs** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval of the **Underwriter**, such approval shall not be unreasonably withheld. The **Underwriter** shall not be liable for **Defense Costs** incurred, settlements made or judgments admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld.

21.  Part 6 of the policy contains the Common Policy Definitions, and defines **Defense Costs** as:

> Any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim**, whether by the **Insured** with the **Underwriters'** consent or directly by the underwriter, in the investigation, adjustment, defense and appeal of a **Claim**[.]

Philadelphia's Claim Handling and Other Conduct

22.  Upon CSF's notice and tender of the defense of this matter to the insurer, Philadelphia did not undertake to manage the defense, but instead ceded to CSF the responsibility for the defense of the counterclaim, including selecting appropriate legal counsel to manage that defense. CSF retained legal counsel with the expectation and understanding that Philadelphia would advance "all reasonable and necessary legal fees and expenses incurred in the defense of [the] Claim" as provided in the policy.

4

23. Despite the policy provision requiring Philadelphia to advance the cost of defending claims against CSF, Philadelphia knowingly and repeatedly failed and refused to advance such costs and fees which, in turn, required CSF to finance the defense of the claims made against it.

24. Philadelphia unreasonably refused to honor the contract and policy of insurance issued to CSF in numerous ways, including but not limited to (1) unreasonably withholding consent of CSF's request to include trademark specialists in the defense of the counterclaim, (2) unreasonably refusing to approve the payment of legal fees for knowledgeable counsel in the area of trademark infringement, (3) refusing to acknowledge that fees for separate local counsel are necessary in federal district court pursuant to court rules, (4) refusing to acknowledge that the claims by the parties were inextricably intertwined such that the defense of one cannot be objectively separated from the prosecution of the other, (5) imposing restrictions outside of the insurance policy upon CSF and its counsel, (6) unreasonably and oppressively interpreting their coverage and defense obligations under the policy, arbitrarily limiting the hourly rate for counsel despite the actual cost and/or the prevailing fees in the industry, and interpreting policy provisions so as to deny CSF reasonably anticipated benefits under the policy, (7) refusing to adopt a reasonable approach to the allocation of fees between defense of the counterclaim and prosecution of the complaint to the extent necessary, and (8) generally prejudicing the interests of its insured by denying the payment of legal defense fees which influenced the timing and substance of the settlement ultimately reached in the Sutton Rodeos litigation.

25. By way of specific example, Philadelphia's employees and agents from the outset of the litigation failed and refused to pay invoices from CSF legal counsel based upon Philadelphia's insistence that counsel somehow separate time spent on the complaint versus time spent on the counterclaim. Philadelphia was repeatedly advised that this demand was not only unreasonably

inefficient and burdensome, but also factually and legally not possible given the similar factual and legal issues presented in the pleadings.

26. In other words, both CSF in its Complaint and Sutton Rodeos in the Counterclaim alleged right, title and interest to the trademarks, and further alleged the other party infringed.

27. An allocation or percentage reduction in total fees as described in the policy was not acceptable to Philadelphia. Philadelphia insisted on an arbitrary and unreasonable division of attorney time spent on the Complaint versus the Counterclaim, and persisted in its failure and refusal to pay any defense costs as mandated in the policy until its unreasonable demands were met.

28. In addition, Philadelphia claimed that billing rates and other "requirements" it imposes upon counsel it hires and retains when it chooses to undertake and manage the defense of a Claim applied to its insured's retained counsel, despite Philadelphia's refusal to undertake and manage defense of the claim itself.

29. Having failed and refused to undertake and manage the defense, Philadelphia had a duty to "advance the Defense Costs" to its insured which per the policy definition mandated payment of "any reasonable and necessary legal fees and expenses incurred in the defense of [the] Claim[.]"

30. Philadelphia did not claim that CSF's retained counsel's rates were unreasonable for the locality and counsel's experience - it simply represented and mandated that its payments were limited to the Philadelphia's internal policies which were never part of and in conflict with the policy of insurance issued to CSF.

31. Relatedly, Philadelphia repeatedly misrepresented the policy benefits and insisted that the policy provides for payment for a single attorney, regardless of the nature of the claim or

forum of the litigation. From the outset Philadelphia was aware that its insured CSF had been sued for trademark infringement in federal district court and was further aware that trademark infringement was a highly specialized area of the law.

32. As such, Philadelphia knew and understood that its insured would need the expertise of an attorney with experience in trademark litigation to properly defend the claims.

33. Philadelphia also knew or should have known that experienced trademark attorneys are in short supply in Western South Dakota, and that for proper defense of the claims CSF would by necessity have to rely upon specialized, out-of-state counsel for the proper defense of the claims.

34. Further still, Philadelphia was aware that the United States District Court for the District of South Dakota by local court rule mandated that out-of-state counsel associate with counsel admitted to practice in the District ("local counsel") and that local counsel be responsible for filing each and all pleadings and be present in any proceedings. In other words, Philadelphia knew CSF would need no less than two attorneys to properly defend the claims.

35. At all relevant times Philadelphia was aware that Sutton Rodeos had three attorneys of record – an out-of-state trademark specialist, a local attorney specializing in trademark litigation, and their long-standing local attorney.

36. Knowing all of this, and being aware that it was responsible to advance "any reasonable and necessary legal fees and expenses incurred in the defense of [the] Claim[,]" Philadelphia unreasonably withheld consent of CSF's trademark counsel and took the position that it would pay fees for a single attorney at an arbitrary rate that was unilaterally set by Philadelphia.

37. Philadelphia took this position based upon a "defense billing requirements" memorandum which Philadelphia misrepresented was part of CSF's policy and altered Philadelphia's obligations under the policy.

7

38. Philadelphia knew its position was not in any way supported by the policy of insurance it drafted and sold to CSF, and in fact Philadelphia's position that it was obligated to only pay for a single attorney (at an arbitrary and reduced rate of pay) amounted to the payment of less than 15% of the reasonable and necessary legal fees incurred by CSF.

39. Philadelphia's unreasonable positions and handling of this matter was done knowing its insured was incurring significant legal expense to its financial detriment, and was undertaken with the purpose of avoiding its obligations and CSF's reasonable expectations under the policy, as a strategy to frustrate and discourage CSF and its attorneys, to coerce CSF to accept less in benefits that it was entitled under the policy of insurance, or to simply cause CSF to abandon a claim to any benefits under the policy entirely as simply too burdensome and frustrating.

40. Section XIX of the Common Policy Conditions in Philadelphia's policy of insurance addresses allocation where the claims and allegations presented against an insured present losses covered by the policy, along with others not covered:

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Organization**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered **Loss**.

"Loss" is defined in the policy as "Damages" and "Defense Costs[.]"

41. To the extent Philadelphia contends or contended that the situation facing its insured CSF implicated Section XIX of the policy due to the existence of the complaint and counterclaim, Philadelphia did not undertake and use its best efforts to work with its insured to come to a fair and proper allegation of fees and expenses pertaining to "covered" and "uncovered losses." Instead, Philadelphia unilaterally determined whether a bill would be paid, what conditions were to be met before bills would be considered, what type of work would be deemed covered, what

Case 5:17-cv-05049-JLV   Document 1   Filed 06/12/17   Page 9 of 16 PageID #: 9

rates of pay applied and whether more than a single attorney would be included in the Defense Costs.

42. Philadelphia's lack of good faith and incentive to prejudice its insured in this regard is further demonstrated by review of the policy endorsements, which provide that where Philadelphia accepts the defense of the case (as opposed to advancing defense costs incurred by the insured), Philadelphia assumes the full cost of defense for covered and uncovered claims, and "one hundred percent (100%) of reasonable and necessary Defense Costs ... will be considered covered Loss[.]"

43. Philadelphia, therefore, had an incentive based upon its interpretation of the policy to decline to undertake to manage and defend the claim and instead compel the insured to take the lead, particularly where there may be both claims which are covered under the policy and those which are not. Where Philadelphia undertakes the defense no allocation is permitted – it pays for 100% of the costs. Where on the other hand the insured is undertaking the defense (subject to Philadelphia "advancing" all "Defense costs," which it did not do) the policy refers to this allocation procedure.

44. Even having gamed the system by having its insured proceed to defend the claim with retained counsel, Philadelphia did not comply with its duties under the policy to work with CSF to fairly and properly allocate the defense costs, and instead unilaterally determined what would be paid.

45. In addition to taking positions inconsistent with the policy, Philadelphia on at least one occasion committed to paying for certain aspects of the defense, only to later fail and refuse to pay despite CSF's reliance. Philadelphia from the outset pushed for CSF to mediate the dispute

with Sutton Rodeos, presumably to save Philadelphia costs it would otherwise have a duty to pay under the policy.

46. Philadelphia agreed to pay half of CSF's attorney's fees for counsel to prepare for and participate in mediation early in the case, which CSF relied upon to commit to participate in mediation.

47. When thereafter presented with the invoice for the fees it had agreed to pay, Philadelphia refused to make the payment.

48. This unreasonable and unlawful conduct was part of Philadelphia's strategy of improper and illegal claims handling designed to frustrate, prejudice and ultimately dissuade CSF from taking advantage of the benefits of the policy of insurance it had paid for.

49. Nineteen months after the Counterclaim was filed against its insured, and after CSF had made numerous time-consuming pleas to obtain the policy benefits, Philadelphia unilaterally determined that it would "process payment in the amount of 20% of the billing," but for local counsel only. Despite being aware that CSF's opponent had three lawyers (two of which were trademark litigation specialists), and that experienced trademark counsel was reasonable and necessary to properly defend the counterclaim, Philadelphia nonetheless maintained that "the trademark litigation Atty. will have to be funded by the Insured. We [Philadelphia] do not authorized (sic) more than one defense atty" even despite the legal requirement for local counsel where the lead counsel is not licensed in the jurisdiction of the case as here.

50. At the time Philadelphia knew that its position was not supported by the insurance policy, and was in fact entirely inconsistent with its express duty to advance "any reasonable and necessary legal fees and expenses incurred in the defense of [the] Claim."

51. In addition to its unilaterally-imposed 20% reimbursement rate and single attorney limit, Philadelphia also continued to represent to CSF that its duty and obligation under the policy was for reimbursement at Philadelphia's panel counsel rate of $185.00 per hour per Philadelphia's internal "defense billing guidelines" which are not part of CSF's policy.

52. Incredibly, these unilateral and unreasonable restrictions were largely academic as Philadelphia refused to make *any* payment for *any* amount for the first *two years* of the counterclaim litigation.

53. Philadelphia's first payment for fees that it was to be 'advancing" per the policy was April 28, 2015 in the amount of $106.61, nearly than two years after its insured was sued on a claim Philadelphia knew was covered under the policy.

54. Twenty-three months after it's insured had to defend against an obviously covered claim, Philadelphia, again unilaterally, adjusted its position such that it would pay for one half of the hours expended by CSF's trademark litigator and local counsel, with hourly rates capped at $200 per hour.

55. When unilaterally imposing these restrictions Philadelphia knew or with reasonable investigation should have known that a trademark litigator charged well in excess of $200 per hour, and that by definition Philadelphia was thus breaching its duty and obligation to advance "any reasonable and necessary legal fees and expenses incurred in the defense of [the] Claim[.]" The usual and customary rate for experienced trademark litigators is as high as $700 per hour, the amount CSF incurred in defending this matter.

56. Philadelphia's unilateral reimbursement restrictions remained in place until the case, including the counterclaim, was settled through mediation.

11

57.     Philadelphia's failure and refusal to honor the contract in terms of paying legal expenses influenced the timing and terms of the settlement.

58.     When accounting for the unilateral restriction of reimbursing only fifty percent (50%) of the hours expended by counsel, and the arbitrary cap of $200/hour per attorney (a further sixty percent (60%) reduction for necessary trademark litigation counsel), Philadelphia paid only a fraction of what was owed under the policy of insurance and certainly less than "any reasonable and necessary legal fees and expenses incurred in the defense of [the] Claim[.]"

Damages

59.     As a result of the above, CSF was damaged in several respects, including but not limited to the payment of attorney's fees and costs far in excess of that which it would have been obligated to pay if Philadelphia had honored the policy. Specifically as it pertains to the balance of attorney's fees and costs, Philadelphia failed and refused to pay the following amounts:

a.     Christopher Benson Law - $72,018.50
b.     Clayborne Loos & Sabers - $65,752.00
c.     Cochran Freund & Young (November 2013 - October 2014) - $44,701.51

TOTAL: $182,472.01

60.     Pursuant to the contract Philadelphia was obligated to pay "all reasonable and necessary [attorneys] fees and expenses incurred in the defensed of [the] claim," which it did not do.

61.     If an allocation was necessary as between matters covered by the policy and matters not covered, Philadelphia was obligated to use its best and good faith efforts to agree upon a fair and proper allocation, which it did not do.

62.     CSF requests that a jury should decide a proper allocation, to the extent an allocation was or is warranted under the policy, facts and circumstances.

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT

63. Plaintiff reasserts all prior allegations as previously set forth herein.

64. Philadelphia had legal duties and obligations pursuant to the law of South Dakota and the contract of insurance as described above, including but not limited to the duty to fully defend its insured against counterclaims covered under the policy.

65. CSF fulfilled each and all conditions and obligations it had pursuant to the policy, including but not limited to full and timely payment of premiums charged by Philadelphia for the coverage set forth in the policy.

66. Philadelphia breached the contract of insurance as set forth above.

67. In addition to the specific terms breached by Philadelphia, it further breached the covenant of good faith and fair dealing it owed its insured in the acts set forth above.

68. As a legal and proximate cause of Philadelphia's breach of the insurance contract, CSF has been damaged as set forth herein and in an amount to be determined by a jury.

## SECOND CAUSE OF ACTION – INSURANCE BAD FAITH

69. Plaintiff reasserts all prior allegations as previously set forth herein.

70. Philadelphia owed its insured CSF a legal duty to handle all aspects of the claim in good faith.

71. Philadelphia's conduct as exemplified herein constitutes the tort of insurance bad faith.

72. Philadelphia consciously engaged in wrongdoing, including misrepresenting benefits and imposing restrictions and conditions foreign to the policy, during the processing of the claim.

73. Philadelphia consciously and wrongfully failed to comply with the duties required of it under the insurance contract.

74. Philadelphia denied and unreasonably restricted the policy benefits to which CSF was entitled under the policy of insurance and generally failed and refused to reasonably handle and defend the claims against its insured under the terms of the policy without any reasonable basis, and with express knowledge that it had no reasonable basis to deny and/or restrict such benefits.

75. As a result of Philadelphia's bad faith, CSF has been damaged as set forth herein and in an amount to be determined by a jury.

### THIRD CAUSE OF ACTION – VEXATIOUS REFUSAL TO FULLY DEFEND

76. Plaintiff reasserts all prior allegations as previously set forth herein.

77. SDCL § 58-12-3 governing the conduct of insurers licensed to do business in South Dakota provides in part:

> In all actions or proceedings hereafter commenced against any ... insurance company, ... if it appears from the evidence that such company ...has refused to pay the full amount of such loss, and that such refusal is vexatious or without reasonable cause, the ... trial court and the appellate court, shall, if judgment or an award is rendered for plaintiff, allow the plaintiff a reasonable sum as an attorney's fee to be recovered and collected as a part of the costs, provided, however, that when a tender is made by such insurance company, exchange or self-insurer before the commencement of the action or proceeding in which judgment or an award is rendered and the amount recovered is not in excess of such tender, no such costs shall be allowed. The allowance of attorney fees hereunder shall not be construed to bar any other remedy, whether in tort or contract, that an insured may have against the same insurance company or self-insurer arising out of its refusal to pay such loss.

78. CSF presented to Philadelphia a covered loss as set forth above.

79. Philadelphia refused to pay the full amount of such covered loss, including the refusal to pay for the defense of the claim as set forth above.

80. Such refusal by Philadelphia was vexatious and without reasonable cause entitling CSF to recover its attorney's fees in prosecuting the herein action, in addition to the other damages sustained as determined by a jury.

## FOURTH CAUSE OF ACTION – MISREPRESENTATION

81. Philadelphia misrepresented coverage and available benefits as set forth herein in violation of SDCL § 58-33-5, entitling plaintiff to recover its actual damages, including attorney's fees, pursuant to SDCL § 58-33-46.1.

82. Among other things, Philadelphia misrepresented to CSF that the policy contained and included attorney fee billing restrictions that it knew were not part of the policy.

83. As a result of these misrepresentations and the refusal to pay benefits as set forth herein, CSF incurred expenses in paying a greater share of defense costs than should have been afforded under the policy.

## PUNITIVE DAMAGES

84. Plaintiff reasserts all prior allegations as previously set forth herein.

85. Philadelphia's actions, inactions and conduct as set forth herein were malicious and with complete and/or reckless disregard for the rights of its insured such that exemplary damages are warranted in an amount to be determined by a jury.

WHEREFORE, CSF respectfully asks the Court to render judgment on its behalf and award as follows:

1. A judgment in its favor against the Defendant on all counts;
2. An award of Compensatory Damages in an amount to be determined at trial;
3. An award of Punitive damages in an amount to be determined at trial;
4. Attorney's fees and costs as allowed by law;
5. Prejudgment interest; and
6. Such other relief as may be just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated this 12th day of June, 2017.

                CLAYBORNE, LOOS & SABERS, LLP

By: _____
      Michael C. Loos
      Attorneys for Plaintiff
      2834 Jackson Blvd., Suite 201
      P.O. Box 9129
      Rapid City, SD 57709
      (605) 721-1517
      (605) 721-1518 (facsimile)